IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. JAYCEE CEDRIC THOMPSON, Appellant. | No. 85984-6-I DIVISION ONE PUBLISHED OPINION |

HAZELRIGG, C.J. — Jaycee Thompson appeals convictions for murder in the first degree, attempted robbery in the first degree, attempted murder in the first degree, and kidnapping in the first degree. Each conviction included a firearm enhancement. Thompson avers that the trial court erred when it overruled his GR 37 objection to the State's peremptory challenge of juror 27, who self-identified as Asian. In a statement of additional grounds for review, Thompson also challenges the sufficiency of the evidence and an evidentiary ruling. We conclude, in light of the totality of the circumstances, that an objective observer could not have viewed race or ethnicity as a factor in the State's peremptory challenge of juror 27. Accordingly, the trial court did not err when it overruled Thompson's GR 37 objection, and we affirm.

FACTS

Thompson's primary assignment of error is procedural, so the underlying facts are of minimal import. Thompson was involved in several incidents in a West

Seattle neighborhood from the night of June 19 into the early hours of June 20, 2022. Officers from the Seattle Police Department arrested Thompson on June 21, and the State filed initial charges a few days later. After subsequent amendments to the information, Thompson was tried by a jury in September 2023 on two counts of murder in the first degree, attempted robbery in the first degree, attempted murder in the first degree, and kidnapping in the first degree. Each count also carried a firearm enhancement.[1]

Prospective jurors completed a questionnaire to assess their fitness to serve prior to the commencement of jury selection. Juror 27 provided the following relevant responses to the questionnaire:

> [Q:] What category best describes you? Your answer to this question is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service.
>
> [A:] Asian.
>
> [Q:] Is there anything not covered by this questionnaire that you feel we should know about you? If so, please explain.
>
> [A:] My mother helped found the [F]reedom [P]roject in Washington.[2] I know several people who have been incarcerated.
>
> [Q:] State whether you agree or disagree with the following statement: Most of us have some degree of implicit bias, meaning that we sometimes unconsciously make judgments and have preconceptions about . . . .[3]
>
> [A:] Agree.

---

[1] Thompson was also charged with unlawful possession of a firearm in the second degree. However, the trial court severed this charge for trial, and it is not the subject of his present appeal.

[2] According to its website, the "Freedom Project works alongside the community to dismantle systems of oppression and heal from the traumatic effects on people targeted and impacted by incarceration, on their loved ones, and on our community." FREEDOM PROJECT, https://freedomprojectwa.org/ (last visited Jan. 26, 2026).

[3] The remainder of this question is cut off in the exhibit provided in the record on appeal.

[Q:] State whether you agree or disagree with the following statement: Racism against black people is mostly a thing of the past.

[A:] Disagree.

[Q:] State whether you agree or disagree with the following statement: Historically, black people in this country have been treated less fairly by the criminal justice system, including the courts and . . . .[4]

[A:] Agree.

[Q:] Do you have any concerns for any reason about your ability to be a fair and impartial juror in this case?

[A:] Yes.

[Q:] If you answered "yes" to the preceding question, please briefly explain.

[A:] I think the criminal justice system in America is deeply flawed and incarcerates far too many people for minor crimes. I believe our prison system is driven by profit and a need for retribution that does not serve rehabilitation.

[Q:] Do you have strong feelings, either positive or negative, about law enforcement officers?

[A:] Yes.

During jury selection, which was conducted over Zoom[5] with members of the pool appearing in three distinct panels, juror 27 was first questioned by the court regarding the possible hardship posed by serving. Juror 27 answered that his employer opposed his jury service because of the length of the trial, noted that he worked on a small team, and explained that the team would experience difficulty due to his absence. The court asked if jury service would be a financial hardship for him personally, to which he replied, "It would be some financial hardship, but,

---

[4] The remainder of this question is also cut off.
[5] "Zoom" is an Internet-based videoconferencing platform

- 3 -

uh, you know, I think personally I can probably handle it. It's—but it's definitely going to cost me quite a bit of money." The court declined to excuse juror 27 based on hardship. Later, during the examination of panel two of the venire, the State asked juror 27 to expand on his questionnaire responses about his views on the criminal legal system. After questioning another potential juror about their feelings about law enforcement and the system as a whole,[6] the prosecutor turned to juror 27 and the following exchange occurred:

> [STATE]: I'm going to jump to 27 as well, 'cause I know that you had some similar feelings about the criminal justice system. Same question, is it focused on police, or is it the system in a—in a whole?
>
> JUROR NO. 27: Uhm, I think it's focused on policing and also, uh, incarceration. Uhm, I think we're a little bit quick to—to lock people up in this country. Uhm, and I think it's a little bit, uh, corporatized and, uhm, a little—little iffy in my opinion.
>
> [STATE]: When you say corporate—"corporatized," does that mean you think it's sort of driven by capitalism?
>
> JUROR NO. 27: Uh, yeah, the prison system I think is, uh, specifically private prisons, uhm, kind of like capitalism, yeah.
>
> [STATE]: And does that extend beyond the minor crimes that you indicated, or do you have concerns about major crimes as well?
>
> JUROR NO. 27: Uh, yeah. I mean, I think it's probably just the—the overall system. Uh, but it definitely applies more to—to minor crimes. I mean, I think that's where the— the problem is—is biggest, uhm, yeah.
>
> [STATE]: So, say, let's talk about major crimes. What do you think the fix would be on major crimes? When we have major crimes of violence in our—in our system, what should we be doing?

---

[6] The State had asked the other juror, "When you talk about your strong feelings regarding law enforcement officers, can you talk to us a little bit about that?" and "Now, thinking systematically, we're here as part of the criminal justice system today. Do you have any concerns about just the system in general beyond police, or is your concern specifically related to the police's role in the system?"

JUROR NO. 27: Well, I think we should concentrate more on rehabilitation, uhm, and not—you think, I think there's obviously a place where people are going to be a danger to society and, uh, you know, they're really going to go out and commit more crimes. Then, yes, they need to be sequestered. But, I don't think our prison system does a particularly good job of ensuring that those people are [sic] going to commit crimes again. It's more of just like a timeout, uh, you know, come back to us when you're probably worse. Uh, so, that's [inaudible] I feel.

[STATE]: So, taking your ideas and your thoughts and—and I think you're probably not alone in those, putting them into the role of a juror and being able to follow the laws the Judge lays it down for you, the guidelines, the guidance, the instructions that he's giving you, if those instructions don't comport with your ideological understanding or belief system, how are you going to work through that?

JUROR NO. 27: Uhm, I mean, I think I can understand that, you know, I live in a—in a flawed system, right? I don't think society is perfect. Uhm, and I'm willing to participate in society. Uh, and that means sometimes going against things that I personally, uhm, feel are perhaps not correct. Uh, so I think I'd be able to participate and to follow, you know, rules, so to speak, uhm, on that.

[STATE]: Now, as far as it comes to your co-jurors, how are—because of your—your unique system, how are you going to ensure as—as your role as a juror that Mr. Thompson is getting the fairest jury possible? What do you see your role as a juror in making sure that this is a fair trial?

JUROR NO. 27: I mean, I—I think my role is to just to listen and to look at the evidence as is presented and, uh, to try and, uhm, come to a conclusion that is, uh, you know, in line with the—the letter of the law, I suppose, uhm, or the spirit. Well, yeah, the letter of the law.

[STATE]: And keeping that in mind, if you were to have a disagreement with jurors, other jurors, talk us through how you would process the facts and process any sort of disagreement when it comes to that time to go to the jury box?

JUROR NO. 27: Uh, if I had a disagreement with somebody, I—I think I would want to talk it through with them, uh, you know, use empathy to see where they're coming from and, uh, see why they

are, uh, viewing it in the way they are and—and to talk through with them to see if we can come to some sort of understanding or, uh, you know, try and get our—our world views to—to line up to, uh, figure out what's—what's going on.

Next, Thompson's counsel questioned juror 27 as follows about whether his opinions would prevent him from giving the State a fair trial:

> [DEFENSE COUNSEL]: You indicated in response to Counsel's questions that you had certain views about the legal system and the prison system?
>
> JUROR NO. 27: Uh, that's correct.
>
> [DEFENSE COUNSEL]: That private prisons make a profit from keeping people in prison, something like that?
>
> JUROR NO. 27: Yeah, and also just that our justice system is I think more focused on being punitive and, uh, not as focused on making sure that people are—well, on the—on the overall safety of our—our communities. Uhm, I think it's more about the catharsis of punishing people and knowing that, you know, that person has been punished for their crime than, uhm, you know, I think the actual goal should be making sure that that person does not repeat that crime, uhm, or is able to, you know, hopefully reintegrate themselves into society. Uh, so, uh, yeah, those—those are my views.
>
> [DEFENSE COUNSEL]: So—so, let me ask you this: Do your views about the legal system—is there a reasonable possibility that your views about the legal system or the prison system, would those views prevent you from giving the State of Washington a fair trial?
>
> JUROR NO. 27: Uhm, you know, I think I am probably able to put myself, uh—you know, remove myself from those views, uhm, you know, to put myself into the system that I am part of and, uh, I think I would be able to—to do my—my duties as a—as a juror.
>
> [DEFENSE COUNSEL]: So, you're—you're reasonably confident that you could base your decision in this case on the evidence and solely on the evidence, and that you would follow the Court's instructions regardless of what—what you think the law is or ought to be.
>
> JUROR NO. 27: I mean, I think I would do my best. But, uh, you know, as other people mentioned, they're—we all have our

implicit biases and our blind spots, uh, you know, myself included. And I—I try my best to be aware of those. But, uh, they are blind spots for a reason.

After Juror 27 told Thompson's counsel that he could carry out his duties as a juror and would "do [his] best" to follow the court's instructions and base his decision on the evidence, the State did not ask him any further questions or challenge him for cause.

At the conclusion of voir dire, as the parties worked through the members of the jury pool who had not been stricken for cause, the State exercised a peremptory challenge against juror 27. Thompson objected based on GR 37, and the State offered the following rationale for the challenge:

> [STATE]: . . . So, Juror 27's questionnaire indicated that his mother helped found the Freedom Project in Washington. He's known—he knows several people who have been incarcerated. He thinks the criminal justice system in America is deeply flawed and incarcerates too many people for minor crimes. He believes the prison system is driven by a need for profit and a need for retribution and that does not serve rehabilitation. He noted that he would probably be able to use—to remove himself from his views to do his—do his duties, but that he would do his best to be fair. He thinks justice is focused on—on punitive rather than—and it's more about the catharsis and punishment, rather than making sure someone does not repeat the crime.
>
> Your Honor, looking at the notes that he said and the way he appears, he self-identified as an Asian man. We think an objector—objective observer could be aware that he has a bias against the system as a whole, that he thinks the criminal justice system is flawed. We have concerns that we—we don't think that he would be able to remain fair and impartial, and that his distrust of the system in general would spill over into not just his assessment of the facts, but even listening to witnesses provide information.

Thompson's counsel then argued that juror 27 indicated that his views on the legal system "would not make it hard for him to give Washington a fair trial" and the State's proffered justification for the peremptory challenge "raise[d] . . . the

presumption of reasonable possibility of bias." The trial court disagreed and overruled Thompson's objection.

The jury acquitted Thompson on one of the counts of murder in the first degree and found him guilty as charged on all remaining counts. The court sentenced Thompson to a total of 718 months' confinement, which included mandatory consecutive time for the firearm enhancements.

Thompson timely appealed.

## ANALYSIS

I.      Denial of Defense GR 37 Objection to State's Peremptory Challenge

The state and federal constitutions mandate a fair and impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Our state Supreme Court adopted GR 37 to carry out this mandate. *State v. Tesfasilasye*, 200 Wn.2d 345, 347, 518 P.3d 193 (2022). The rule "directs trial judges to deny a peremptory challenge when an objective observer could view race as a factor in its use." *Id.*

Once a party has exercised a peremptory challenge, the other party or the court may object "to raise the issue of improper bias." GR 37(c). The burden then shifts to the party who has just used its peremptory challenge to "articulate the reasons" it has been exercised. GR 37(d). The trial court must then "evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances," and if it "determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge," then it must deny the peremptory challenge. GR 37(e). "The court should explain its ruling on the

record." *Id.* Nevertheless, we review the trial court's GR 37 ruling de novo. *State v. Bell*, 5 Wn.3d 54, 58, 571 P.3d 272 (2025).

Here, Thompson avers that the trial court erred when it overruled his GR 37 objection to the State's peremptory challenge of juror 27. Because an objective observer could not have viewed race as a factor in the State's use of the peremptory challenge, we disagree. In doing so, we endeavor to further clarify the application of GR 37 to provide guidance for trial courts and practitioners.

A.      Policy, Purpose, and Scope

An understanding of the scope and purpose of GR 37 is necessary to its proper application. *Id.* at 66. The rule applies to all jury trials, and its purpose is "*to eliminate* the unfair exclusion of prospective jurors based on race or ethnicity." GR 37(a)-(b) (emphasis added). It aims to "guarantee the constitutional rights of both defendants and prospective jurors" who have been historically prosecuted or excluded from civic participation, including jury service, on the basis of their race or ethnicity. *Id.* at 66-67; *see also State v. Sum*, 199 Wn.2d 627, 641, 511 P.3d 92 (2022) (explaining GR 37 framework recognizes that "'racial bias is a common and pervasive evil that causes systemic harm to the administration of justice'" (quoting *State v. Berhe*, 193 Wn.2d 647, 657, 444 P.3d 1172 (2019))). And to address that history, we first must identify and acknowledge it. *See Sum*, 199 Wn.2d at 640 ("Our recent history has made notable strides toward recognizing and rejecting racial injustices.").

To this end, the history of our state and the nation has been marred by the exclusion of people of Asian American and Pacific Islander (AAPI)[7] descent or origin from aspects of civil life through means that while racially biased were then lawful.[8] Before Washington was even a state, exclusion was the law of the land: The Chinese Exclusion Act of May 6, 1882, ch. 126, 22 Stat. 59-61 (repealed 1943), curtailed the immigration of Chinese workers, whose immigration had drawn a violent backlash from White Americans all over the west, including in what was then the Washington Territory.[9] The act directed that for ten years following its passage, "the coming of Chinese laborers to the United States be, and the same

---

[7] Any attempt to impose a broad label on a diverse group of distinct cultural groups will necessarily fail to capture the unique ways people and communities speak about themselves. We are by no means the first court to wrestle with this experience while maintaining the appropriate respect for the peoples described. *See State v. Sum*, 199 Wn.2d 627, 643 n.6 and 645, 511 P.3d 92 (2022).

Because the focus of this opinion is the common experience of the exclusion of Washingtonians of Asian descent from full societal participation, we have opted to use the broadest term possible while also noting terms of self-identification as appropriate and sought to proceed in a manner that does not compound historical harms.

[8] *See, e.g., Nishimura Ekiu v. United States*, 142 U.S. 651, 664 (1892) (upholding application of Immigration Act of March 3, 1891, ch. 551, 26 Stat. 1084, to Japanese immigrant); *Yamataya v. Fisher*, 189 U.S. 86, 96-97 (1903) (upholding application of act of 1891 again as to 1884 treaty with Japan); *Terrace v. Thompson*, 263 U.S. 197, 224 (1923) (holding Washington law restricting alien ownership of land was constitutional); *Hirabayashi v. United States*, 320 U.S. 81, 104-05 (1943) (upholding internment); *Korematsu v. United States*, 323 U.S. 214, 223-24 (1944) (upholding internment), *overruled by Trump v. Hawaii*, 585 U.S. 667 (2018); *In re Takuji Yamashita*, 30 Wash. 234, 238-39, 70 P. 482 (1902) (holding Japanese non-citizen could not be admitted to Washington State bar).

[9] *Chinese Immigration and the Chinese Exclusion Acts*, U.S. Dep't of St., https://history.state.gov/milestones/1866-1898/chinese-immigration [https://perma.cc/D5U7-HN4Y]; Annual Report of Governor of Washington Territory, H.R. Exec. Doc. No. 1, at 857 (1886) (ser. set 2468) ("The fact is not to be disguised that the people of the Pacific coast, with very few exceptions, possess a spirit of hostility towards the Chinese residents; and, although a large proportion of our citizens entertain feelings of loyalty and patriotism toward the Government, yet in several large towns they are inclined to be lenient to those who engage in acts hostile to the Chinese; and this fact makes it extremely difficult to secure convictions of this class of offenders against the law."); U.S. Dep't of Interior, Letter from Governor of Washington Territory on Amount Expended during Anti-Chinese Disturbance in Seattle, S. Exec. Doc. No. 85, at 1 (1886) (ser. set 2448) (Attesting to "a general agitation and great public excitement ensued here and elsewhere on the Pacific coast, resulting in the actual forcible expulsion of all Chinese residents of Tacoma and other localities in counties contiguous to King County, in the month of November, 1885.").

is hereby, suspended; and during such suspension it shall not be lawful for any Chinese laborer to come or, having so come . . . to remain within the United States." *Id.* at 59. Later, Asian immigrants who had already arrived in the United States faced significant legal difficulties integrating as they were not allowed to become naturalized citizens under the terms of the Naturalization Act of 1906, ch. 3592, 34 Stat. 596 (repealed 1940), its subsequent amendments, and its interpretation by the courts, who held that it only applied to white immigrants. *See, e.g., Ozawa v. United States*, 260 U.S. 197 (1922); *United States v. Thind*, 261 U.S. 204 (1923); *Toyota v. United States*, 268 U.S. 402 (1925). Many states, including Washington, passed laws prohibiting people who were not citizens from owning land, precluding them from building lives for themselves and exercising any related rights.[10]

Meanwhile, under the so-called "Gentlemen's Agreement" of 1908 between Japan and the United States, "Japan agreed to limit the type and number of visas it issued to its citizens coming to the United States. These limitations included denying visas to 'laborers, skilled or unskilled' unless they had previously lived in the United States or were the 'parents, wives, or children under 20 years of age' of such laborers."[11]

---

[10] *See also* Dudley O. McGovney, *The Anti-Japanese Land Laws of California and Ten Other States*, 35 CALIF. L. REV. 7 (1947); Fred L. Morrison, *Limitations on Alien Investment in American Real Estate*, 60 MINN. L. REV. 621 (1975-1976); Keith Aoki, *No Right to Own?: The Early Twentieth-Century "Alien Land Laws" As a Prelude To Internment*, 40 B.C. L. REV. 37; Mark L. Lazarus III, *An Historical Analysis of Alien Land Law: Washington Territory & (and) State 1853-1889*, 12 U. PUGET SOUND L. REV. 197 (1989).

[11] Paul Finkelman, *Coping with a New "Yellow Peril": Japanese Immigration, the Gentlemen's Agreement, and the Coming of World War II*, 117 W. VA. L. REV. 1409, 1445-46 (2015) (citation omitted). As an informal diplomatic agreement there is no official version of the text. However, its substance can be found in the Congressional Record. *See* S. Rep. No. 68-65, at 6073 (1924).

Then, and of particular relevance to Washington State, exclusion of Asian American people from civic life took a carceral turn in 1942. President Franklin D. Roosevelt signed Executive Order 9066, which authorized the secretary of war to

> prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion.[12]

The result was over "120,000 people of Japanese descent from the West Coast, along with a few thousand more transferred from American territories and Allied nations, were detained in camps located throughout the United States."[13] Violations of this order were twice considered by the Supreme Court, and the validity of the order was upheld as an exercise of executive power in wartime. *See Hirabayashi v. United States*, 320 U.S. 81 (1943); *Korematsu v. United States*, 323 U.S. 214 (1944), *overruled by Trump v. Hawaii,* 585 U.S. 667 (2018). In Washington by July 1942, 7,390 people were assembled at what is now the Washington State Fair (formerly the Puyallup fairgrounds) at "Camp Harmony" in preparation for transfer to internment camps in the interior of the country while another 2,451 were assembled in Marysville.[14] Internees began returning home in 1945, but reintegration was difficult, many were starting over and some White Americans on the west coast remained hostile.[15] Internment directly prevented

---

[12] Authorizing the Secretary of War to Prescribe Military Areas, Exec. Order No. 9066, 7 Fed. Reg. 1407 (Feb. 25, 1942).

[13] *World War II Japanese American Incarceration: Mass Removal and Incarceration*, NATIONAL ARCHIVES, https://www.archives.gov/research/aapi/ww2/incarceration.

[14] GEORGE MILLER, PERSONAL JUSTICE DENIED: REPORT OF COMMISSION ON WARTIME RELOCATION AND INTERNMENT OF CIVILIANS, H.R. DOC. NO. 53-124 at 138-39 (1992).

[15] *Id.* at 241.

Japanese-Americans from engaging in civic participation, such as jury duty, during those years, but it also resulted in hampering their re-entry into society at large because of their diminished economic position and ongoing hostility.[16]

In short, the court-sanctioned exclusion of AAPI people from civic participation is part of a "deplorable" history that GR 37 aims to recognize and address.[17] *See Sum*, 199 Wn.2d at 640 ("Every decision of this court makes new history, in which we are 'constantly striving for better'" (quoting Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. at 2 (Wash. June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7]). In applying the rule, courts must not only be cognizant of that history, but also recognize that "the stakes are high, and it can be extremely difficult to determine when a justification is influenced by racial bias." *Bell*, 5 Wn.3d at 67. Importantly the "rule was *designed to be overinclusive* in order to be effective,"

---

[16] For example, "Governor Wallgren, newly-elected in the State of Washington, continued to favor mass exclusion; he was ' extremely antagonistic toward the Japanese and . . . positive in his assertion that a mistake had been made, from the point of view of the war effort, in allowing any to return and that this mistake should be remedied.'" *Id.* at 240 (alteration in original).

[17] At oral argument before this court, the State was asked if there was a "established history of disproportionate incarceration of Asian Americans in [the Pacific Northwest]?" To which counsel for the State responded, "I would have to do some research on that, but I honestly don't believe that is what this factor is driving at." Wash. Ct. of Appeals oral arg., *State v. Thompson*, No. 85984-6-I (Sept. 10, 2025), at 13 min., 55 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/video/division-1-court-of-appeals-2025091138/.

Apparently in response to the court's inquiry, the State filed a statement of additional authority contending that "persons of Asian descent comprised nine percent of the population of Washington State in both 2019 and 2021, yet they comprised only two percent of the local jail population in 2019, and only four percent of the state prison population in 2021" which "indicates that persons of Asian descent are underrepresented among the incarcerated population of Washington State."

However, this demonstrates only that the State misunderstands the nature of the harm GR 37 is intended to ameliorate. The number of Asian Americans who are presently incarcerated does not speak to the past harm and ongoing biases the rule is designed to address. As *Sum* instructs, we cannot ignore history when interpreting and applying a rule in the present when its purpose is to prevent the wrongs of the past from being perpetuated into the future. 199 Wn.2d at 641.

and "trial courts must be especially prudent in denying peremptory challenges in light of GR 37 objections to fulfill the rule's purpose." *Id.* at 66-67 (emphasis added). With these principles in mind, we turn to the mechanics of the rule and the trial court's compliance therewith in the instant case.

### B. Objection, Response, and Determination

As explained, once a GR 37 objection has been raised, "the party exercising the peremptory challenge shall articulate the reasons the peremptory challenge has been exercised." GR 37(d). Here, the State indicated it was exercising a peremptory challenge against juror 27 because "his mother helped found the Freedom Project in Washington," "he knows several people who have been incarcerated," and he had criticisms of the criminal justice system. The State noted that juror 27 self-identified as Asian, although the context does not indicate that the State supplied this as an express justification for the peremptory challenge, nor does Thompson argue that it was. Thompson's counsel then countered that juror 27 had indicated he could be fair. Thompson's counsel also observed that the State's reasons for challenging juror 27 seemed to implicate some of GR 37's presumptively invalid reasons, which we address in more detail *infra*.

At that point, the trial court was required to evaluate, on the record, the justification provided by the State in light of the totality of the circumstances to determine "if an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." GR 37(e). Under this rule, "an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors

in Washington State." GR 37(f); *see also Berhe*, 193 Wn.2d at 665; *Henderson v. Thompson*, 200 Wn.2d 417, 421, 435, 518 P.3d 1011 (2022); *Simbulan v. Nw. Hosp. & Med. Ctr.*, 32 Wn. App. 2d 164, 170, 555 P.3d 455 (2024). This includes awareness that AAPI people have historically been excluded from civic participation in our State, even in the absence of knowledge of the specifics set out in Section I.A, *supra*. *See Sum*, 199 Wn.2d at 642-43 ("[A]n objective observer in Washington 'is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in' many injustices against [Black, Indigenous, and other People of Color (BIPOC)], particularly in the criminal justice system." (quoting GR 37(f)). Again, we review the trial court's ruling de novo. *Bell*, 5 Wn.3d at 58.

Here, the trial court ruled, in full, "All right. I find the reasons given by the State has [sic] overcome any kind of alleged improper presumptive excusal under Juror—GR 37. I will allow—or the State can use this peremptory against this juror, noting the Defense's objection." The trial court's ruling failed to comply with GR 37(e) in two critical respects.

First, the trial court failed to explain its reasoning on the record. Instead, it stated in conclusory fashion that the State had "overcome any kind of alleged improper presumptive excusal," without articulating which of the presumptively invalid reasons it believed the State's peremptory challenge implicated. This conclusion is puzzling because, as even the State acknowledges in its briefing, our Supreme Court has not yet articulated what showing must be made to overcome this presumption of invalidity.

- 15 -

Second, the record does not establish that the trial court engaged in the "could view" analysis mandated by the rule. Again, that inquiry requires the court to ask whether, based on the totality of the circumstances, "an objective observer *could view* race or ethnicity as *a factor* in the use of the peremptory challenge."[18] GR 37(e) (emphasis added). "Under the 'could view' standard, a judge is required to deny a peremptory challenge when the effect is discriminatory regardless of whether there was a discriminatory purpose." *Tesfasilasye*, 200 Wn.2d at 357; *see also State v. Lahman*, 17 Wn. App. 2d 925, 938, 488 P.3d 881 (2021) ("GR 37 was written in terms of possibilities, not actualities. The rule recognizes that the trial process must be free from the appearance of discrimination, regardless of actual motive or intent."). Proper application of the standard is important because it is "more likely to prevent peremptory dismissals of jurors based on the unconscious or implicit biases of lawyers." *Tesfasilasye*, 200 Wn.2d at 357.

Here, rather than asking whether an objective observer could view race as a factor in the State's use of a peremptory challenge against juror 27, the trial court

---

[18] GR 37(f) explicitly states that the court is to act an *objective* observer. To this end, the State argues in briefing that "there is nothing in the record suggesting that the trial court was reflecting its own biases in allowing the State to exercise the peremptory challenge." This is accompanied by the following footnote: "It bears mentioning that before his appointment to the bench, the trial judge in this case was a longtime, well-respected, highly experienced criminal defense attorney known for his advocacy against the death penalty."

Thompson rightly criticizes this argument in his reply brief: "The State implies that because the trial judge was previously a respected and experienced criminal defense attorney, he cannot make errors in applying GR 37. This does not follow. That the trial judge was a criminal defense attorney is not relevant to this [c]ourt's review." (Citation omitted.)

The State inappropriately suggests that we should assess facts that can be understood only as relating to how the trial judge may have behaved as a *subjective* observer because his personal background and work history inform how he *personally* may view the issue. It is contrary to the plain language of the rule to make such considerations.

Further, it is illogical, if not dangerous and offensive, to suggest that criminal defense attorneys are somehow immune from implicit bias or uniquely situated to be able to identify, much less remedy, discriminatory conduct within our criminal legal system.

seemed to adopt the State's reasoning wholesale. To that end, the State had reasoned that an objective observer "could be aware that [juror 27] has a bias against the system as a whole, that he thinks the criminal justice system is flawed." The court's acceptance of this framing was error because the standard is not whether an objective observer could believe that *juror 27* was biased but, rather, the State's use of a peremptory challenge *against* juror 27 was an impermissibly biased action based on the factors set out in the rule.

As noted, the trial court also concluded, to the extent the State's justification for challenging juror 27 implicated any of GR 37's presumptively invalid reasons, that the State had "overcome any kind of alleged improper presumptive excusal under . . . GR 37." But the standard requires the court to do more than simply ask whether the reason given for exercising a peremptory challenge is presumptively invalid. To the extent a presumptively invalid reason is given, overcoming that presumption *is necessary* to overcome a GR 37 objection, *but it is not alone sufficient*. Again, the standard requires the court to ask whether an objective observer *could* view race or ethnicity as *a factor* in the exercise of the peremptory challenge in light of the totality of the circumstances. The trial court erred when it failed to engage in this full and necessary inquiry, and because our review is de novo, we now examine the circumstances in view of the record before us.

C.    Presumptively Invalid Reasons Under GR 37(h) as Threshold Inquiry

GR 37 recognizes that certain reasons for peremptory challenges have "historically . . . been associated with improper discrimination in jury selection in Washington State." GR 37(h). These reasons are as follows:

(i) having prior contact with law enforcement officers;

(ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling;

(iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime;

(iv) living in a high-crime neighborhood;

(v) having a child outside of marriage;

(vi) receiving state benefits; and

(vii) not being a native English speaker.

GR 37(h). The rule makes these reasons "presumptively invalid . . . for a peremptory challenge." GR 37(h). Further, the State cannot sanitize a presumptively invalid reason by offering it alongside a race neutral one when exercising a peremptory challenge. *See State v. Orozco*, 19 Wn. App. 2d 367, 375-78, 496 P.3d 1215 (2021). While this section is set out later in the text of GR 37, it may make practical sense for trial courts to consider this as a threshold inquiry; a conclusion that the proffered reason for the peremptory challenge is presumptively invalid can be dispositive, whereas a determination that it is not will require analysis of the other factors set out in the rule under subsection (g).

Here, Thompson contends that the reasons cited by the State for exercising its peremptory challenge were presumptively invalid because they constituted "expressing a distrust of law enforcement" and "having a close relationship with people who have been stopped, arrested, or convicted of a crime" as set out in GR 37(h)(ii), (iii). Although the State did question juror 27 about his views on policing during voir dire, it did not rely on his views on law enforcement to justify its peremptory challenge. Instead, the State relied on juror 27's views on incarceration and the "system as a whole." Accordingly, and although these views are a relevant consideration because, as explained, they might be

disproportionately associated with a particular racial or ethnic community, we conclude that they did not render the State's peremptory challenge presumptively invalid for the reason set forth in GR 37(h)(ii), expressing a distrust of law enforcement.

A closer question is whether the State's peremptory challenge implicates the presumptively invalid reason set forth in GR 37(h)(iii), having a close relationship with people who have been stopped, arrested, or convicted of a crime. The State explicitly justified its peremptory challenge by observing that juror 27 "knows several people who have been incarcerated." Although not identical to "having a close relationship with people who have been stopped, arrested, or convicted of a crime," the State's proffered justification falls dangerously close to a presumptively invalid reason to exercise a peremptory challenge. Furthermore, if bias were the sole factor in the State's decision to use a peremptory challenge against juror 27, then it would not have relied on his relationships with incarcerated people unless it believed those relationships were close enough to affect his ability to be fair. To that end, the State's failure during voir dire to further explore the nature of juror 27's relationships with incarcerated individuals is troublesome from the perspective of an objective observer applying GR 37(g)(i), which allows us to contemplate "whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern." Even when centering the purpose of GR 37 and the extremely important interests at stake, it simply cannot be that the rule permits a party to rely on a GR 37(h)-adjacent justification for a peremptory challenge to create plausible deniability after failing to explore

whether that justification actually crosses the line into presumptive invalidity. And again, although this may not have been the State's intent, GR 37 is "designed to be overinclusive in order to be effective." *Bell*, 5 Wn.3d at 66. However, the deliberate use of "close relationship" in GR 37(g)(iii) indicates that the rule distinguishes between associations that are sufficiently familiar or intimate to trigger the presumption and others that are more tangential or distant such that they do not. Accordingly, consistent with the plain language of the rule, the State did not rely on a presumptively invalid reason to support its peremptory challenge to juror 27.

D.     GR 37(g)—Circumstances Considered by Trial Court

Having determined that the State did not offer any presumptively invalid reasons for its peremptory challenge, we proceed to the application of the other factors to be assessed in ruling on a GR 37 objection. The circumstances that the court should evaluate "include, but are not limited to, the following:"

> (i) the number and types of questions posed to the prospective juror . . . ;
> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;
> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;
> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and
> (v) whether the party [exercising the peremptory challenge] has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(g). We analyze each of these factors in turn.

1.    GR 37(g)(i)—Types of Questions to Challenged Prospective Juror

When we review the number and type of questions the State asked to juror 27, we may also examine "whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it."  GR 37(g)(i).  This point is of particular relevance here, where the State's proffered reason for challenging juror 27 was his alleged bias against "the system."

Specifically, the State asked juror 27 a total of seven questions about his views on the criminal legal system in order to better assess how his ability to perform his duty as a juror might be impacted by his beliefs.  The State asked juror 27 how he would balance "the role of a juror," which required that he follow the trial judge's instructions regarding the law, with his "ideological understanding or belief system" that might be in conflict with directives from the court.  Juror 27 explained that even if he had critiques of the system, he intended to participate as directed.  Specifically, he stated,

> I think I can understand that you know, I live in a—in a flawed system, right? I don't think society is perfect. Uhm, and I'm willing to participate in society. Uh, and that means sometimes going against things that I personally, uhm, feel are perhaps not correct. Uh, so I think I'd be able to participate and to follow, you know, rules, so to speak, uhm, on that.

When the State directly inquired as to whether he would ensure Thompson was "getting the fairest jury possible," juror 27 affirmed that he would "listen and look at the evidence as its presented" to reach a verdict that conformed with "the letter of the law."  Later, when questioned by Thompson's counsel, juror 27 confirmed that

he could probably put his personal views aside and carry out his duties as a juror and he would "do [his] best" to decide the case based solely on the evidence and follow the court's instructions.

In response to Thompson's GR 37 objection, the State offered the following explanation:

> We think an objector—objective observer could be aware that he has a bias against the system as a whole, that he thinks the criminal justice system is flawed. We have concerns that we—we don't think that he would be able to remain fair and impartial, and that his distrust of the system in general would spill over into not just his assessment of the facts, but even listening to witnesses provide information.

The State's justification for its peremptory challenge explicitly referenced the line of questioning it had posed to juror 27, his opinions on the criminal legal system and how those beliefs might impact his ability to serve as a fair and impartial juror. The State sought to understand the scope and nature of juror 27's beliefs and, once those had been articulated to the satisfaction of the prosecutor, it asked juror 27 about the implications of his perspectives on his judgment of the case. Even though juror 27 plainly stated that he believed he could remain impartial, under this portion of the GR 37 analysis, we focus on the nature of the inquiry by the party challenging the juror and the connection, if any, between the questions posed and the justification given for the peremptory strike. Here, the State's peremptory challenge rested squarely on the answers juror 27 had provided.

### 2. GR 37(g)(ii)—Number of Questions to Challenged Prospective Jurors

Next, GR 37(g)(ii) directs us to consider "whether the party exercising the peremptory challenge asked more questions or different questions" to the juror

later challenged with a peremptory strike, compared "to other jurors." This factor is particularly relevant here as the State seeks to defend its peremptory challenge by emphasizing that it struck two other jurors, 61 and 62, for cause after they were asked an equivalent number of questions that were similar in content to those posed to juror 27.[19] The State suggests in briefing that "jurors who expressed strong opinions about prisons were asked similar questions in a similar manner." Therefore, according to the State, the comparison of juror 27 to these jurors supports the trial court's denial of the GR 37 objection.

The State asked juror 61 three questions before it asked that she be excused for cause based on her answers. The State then had a more extended exchange with juror 62 during which the prosecutor asked a total of eight questions, including asking them to explain their opinions on police and why it might be difficult for them to be impartial and set their political views aside. Again, juror 27 was asked a total of seven questions. Admittedly, juror 61 was asked fewer questions, but this is because she quickly stated that she would not be able to be impartial in response to the State's questioning, which makes a direct comparison inapt. However, juror 27 and juror 62 were asked an equivalent number of questions which reflected more extended discussions with the State regarding their opinions on the criminal justice system. A comparison between these two jurors leads us to conclude that there was not a significant disparity between the questions the State asked the jurors, whether they were subject to a strike for cause or a peremptory strike.

---

[19] Juror 61 self-identified as a Caucasian female and juror 62 self-identified as Asian but declined to answer the question regarding gender.

3.    GR 37(g)(iii)—Similar Answers from Other Unchallenged Prospective Jurors

Critical to the assessment of an objection under GR 37 is not only the number of questions posed to the challenged juror vis-à-vis other members of the venire, but also whether those who answered similarly to the challenged juror were the subject of peremptory or for cause challenges. The purpose of this factor is to consider whether there is a pattern of exclusion of certain types of jurors that follows, or deviates, from their answers on similar topics. In doing so, we also look to see if related responses from other jurors went unexplored. Here, again, the focus of our comparison is between jurors 27, 61, and 62, but also includes 25 and 88.

The first question juror 61 was asked was about her answer in the jury questionnaire that she did not think she could be "fair and impartial." Juror 61 stated that she thought she could be "fair and impartial" but could not "be complicit in sending someone to prison." The State then asked if those feelings would change given that the judge would impose the sentence and not her. Juror 61 reaffirmed her response; she could not "live with" herself if she was "complicit."[20] The State's final question was, "[I]f you're presented facts and evidence that you believe has been proven beyond a reasonable doubt, would you be able to find someone guilty?" Juror 61 answered that she would not. The State requested

---

[20] Specially, juror 61 answered,
Well, as I say, I don't think it's fair and impartial. I think I could make a fair assessment. But, of course the jury has something to say about—if—if it's a conviction, we know within some range what the punishment will be. And, uhm— and I just know too many people personally and in courtroom situations. I just can't do it. I can't live with myself if I am complicit in someone to prison."

that she be excused for cause, which Thompson did not oppose, and the court granted the State's challenge for cause.

Juror 62 also explained that they would have difficulty being impartial because of "exposure to. . . the State being unfair to folks that are put in the system," and they expressed concerns similar to juror 61.[21]  When asked by Thompson's counsel whether they could give the State a fair trial, juror 62 responded, "I probably wouldn't be able to put my political views aside" and again indicated to the State that they shared in juror 61's concerns of feeling complicit. The State also requested that juror 62 be excused for cause, which the court granted.

In short, the State asked similar questions of both juror 61 and juror 62 as it did of juror 27, although both of those jurors were challenged *for cause* after they clearly stated they could not be fair.  While the State now contends that juror 27 was similarly biased, his responses diverged from juror 61 and 62 because he seemed to indicate that he could set aside his own belief to carry out his duty as a juror.  Still, there is a marked similarity between how the State handled juror 62 and juror 27, both were asked an extended series of questions to determine if their person beliefs would prevent them from being a fair and impartial member of the

---

[21] Juror 62 explained,
I have only had negative experiences and negative exposure with the State and the police and any kind of State reinforcement.  If it's not pers—like, I—if I had not personally experienced, uhm, negative encounters and conflicts with the police myself, it's always someone else that I know, uhm, both in the United States and overseas in the Philippines.  So, I think that due to a lot of knowing that police can lie and they often do, uhm, and that they could also tell the truth, I think in—in my background and my experience, it would still be difficult for me to sit with my distrust.  Even if, like, a police officer I know is a good person.

jury. Juror 61 was asked fewer questions because it was quickly ascertained that she could not be fair and impartial.

Critically, the State also exercised peremptory challenges against jurors 25 and 88. Juror 25 was asked a total of three questions, fewer than juror 27, and, in response to a question from the State about his feelings towards law enforcement, shared that he had participated in protests in 2020 and his belief that "systemic issues" with policing needed to be addressed. He elaborated, "I don't hold those [systemic issues] personally against, uh, one single police officer, more as the organization as a whole," and stated that his concerns were "specifically related to the police's role in the system." Juror 88 was asked a total of eight questions, some relating to policing and others on his opinions regarding firearms. When the State asked him about police, juror 88 indicated that he may have a bias against police due to "the recent events" around "Black Lives Matter," police reactions to the protests, and accounts from people he trusted "about police lying on the stand." He also stated that he was not sure if he could separate himself from his feelings on law enforcement when he listened to them testify. The record plainly establishes that two other members of the jury pool against whom the State used peremptory challenges were asked either one more or significantly fewer questions than juror 27 about similar topics.

Even if juror 27 believed he was fit to serve, this part of the analysis concerns the content and quantity of the prosecution's questions, not the prospective juror's answers. Here, the State explored the fitness of several jurors by asking if they could separate their personal beliefs that were critical of the

- 26 -

criminal justice system from the requirements that would come with their role on the jury. We conclude that the way that the State went about questioning these jurors did not show significant disparity, such that circumstances could indicate racial or ethnic bias.

   4.   GR   37(g)(iv)—Proffered   Reason   Disproportionately
       Associated with Race or Ethnicity

Thompson contends the justifications offered by the State in support of its peremptory challenge to juror 27 "might be disproportionately associated with a race or ethnicity." *See* GR 37(g)(iv). We agree. Each of the justifications offered by the State, that juror 27's mother helped found an organization that provides services to people impacted by incarceration, that he knew several people who have been incarcerated, and that he had criticisms of the criminal justice system, "might" be disproportionately associated with a member of the AAPI community. This is so because the proffered reasons tread closely to at least two reasons that the rule explicitly deems presumptively invalid in subsection (h). *See Sum*, 199 Wn.2d at 644 ("GR 37 recognizes the disproportionate police contacts experienced by BIPOC."); GR 37(h)(ii), (iii) (providing that expressing distrust of law enforcement or having a close relationship with people who have been convicted of a crime are presumptively invalid reasons for peremptory challenge because they have "historically . . . been associated with improper discrimination in jury selection in Washington State").

However, these concerns are not exclusive to BIPOC individuals as evidenced by the fact that juror 61, stricken for cause, and juror 88, stricken after

a peremptory challenge, who both self-identified as "Caucasian," also expressed trepidation about policing and related issues. Further, the language of GR 37 directs us to consider if the reason given by the State "might be disproportionally associated," but again, the responses of juror 61, juror 25, and juror 88, who were not AAPI reflected similar concerns as the two AAPI jurors, juror 62 and juror 27, who had peremptory strikes used against them. At best, what juror 27 articulated during voir dire was that he had been exposed to a philosophy that included skepticism about the punitive aspects of our criminal legal system and a belief in greater emphasis on rehabilitation, whether because his mother was a co-founder of the Freedom Project or for some other reason. Thompson fails to establish that this reason for the State's use of a peremptory challenge against juror 27 is disproportionately associated with a particular race or ethnicity such that GR 37 is implicated.

5.      GR 37(g)(v)—Disproportionate Use of Peremptory Challenges

Finally, GR 37 directs the trial court to determine whether the party exercising the peremptory challenge under review has used them "disproportionately against a given race or ethnicity, in the present case or in past cases." GR 37(g)(v). Here, the State used preemptory challenges against six jurors in addition to juror 27.[22] On the questionnaire provided to all jurors, five of those against whom the State exercised peremptory challenges, jurors 20, 72, 78, 86, and 88, self-identified as "Caucasian" and the other, juror 25, self-identified as

---

[22] These were jurors 20, 25, 27, 72, 78, 86, and 88.

"Hispanic, Latino, or Spanish." The State did not use a peremptory challenge against any other juror who identified themselves as AAPI. Further, the record is silent as to the prosecutor's past practices with regard to use of peremptory challenges against AAPI jurors or BIPOC jurors more broadly, and Thompson does not argue that the State used peremptory challenges disproportionately against AAPI jurors in this case.

E.     Reliance on Conduct under GR 37(i)

For the sake of completeness, we note that GR 37 acknowledges the use of certain conduct-based peremptory challenges has resulted in or enabled improper discrimination in jury selection. *See* GR 37(i). The rule gives examples: "the prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers." *Id.* Here, the State did not rely on juror 27's conduct to justify its peremptory challenge, and GR 37(i) is not relevant to our analysis.

F.     Despite Incomplete GR 37 Analysis by Trial Court, Denial of Objection Was Not Erroneous

The trial court granted the State's peremptory challenge of juror 27, who self-identified as Asian, after the State justified its peremptory challenge by stating that juror 27 had expressed bias "against the system as a whole" and indicated in his responses to the jury questionnaire that he had concerns about whether he would be able "to remain fair and impartial." The State came close to offering a presumptively invalid reason when it referenced that juror 27 "knew people who

has been incarcerated" but, as explained in Section I.C, *supra*, GR 37(h)(iii) specifies "close relationships," and the extent and nature of juror 27's relationship with incarcerated individuals was not developed on the record. We cannot hold that a passing mention by the State, when followed by other more substantial reasons for exercising a peremptory strike, amounted to reliance on a presumptively improper reason. The State's primary reason for exercising the peremptory strike was concern about juror 27's ability to be fair and impartial given his views on the role of the prison system in this country. The State asked roughly the same number of questions of other jurors and on similar topics as those it posed to juror 27. Critically, the State successfully moved to excuse jurors for cause who offered comparable responses to those of juror 27, which supports its claim that its peremptory challenge was based on the content of his answers and not some other impermissible reason. Finally, the presence of other self-identified Asians on the final jury panel tends to suggest that the State did not disproportionally use peremptory challenges against AAPI jurors, and Thompson makes no such claim here. Accordingly, we must hold that an objective observer *could not* view race or ethnicity as a factor and, despite the absence of clear analysis of the factors set out the in rule (a single conclusory statement that the State had "overcome any kind of alleged improper presumptive excusal") and apparent application of an incorrect standard at points (acceptance of the State's inaccurate framing of the test as whether an objective observer "could be aware that [juror 27] has a bias against the system as a whole" instead of focusing on the State's use of the peremptory challenge against juror 27 as evidence of potential

bias in jury selection and emphasis on overcoming a presumptively invalid reason over other factors set out in the rule), the trial court did not err when it overruled Thompson's GR 37 objection.

II.    Statement of Additional Grounds for Review

Thompson filed a pro se statement of additional grounds for review (SAG) wherein he avers that none of his convictions are supported by sufficient evidence and the trial court erred when it admitted surveillance footage because the State did not provide an adequate foundation or properly authenticate the footage.  We disagree.

    A.    Sufficiency of the Evidence

Again, the jury convicted Thompson of murder in the first degree, attempted robbery in the first degree, attempted murder in the first degree, and kidnapping in the first degree.  In his SAG, he challenges the sufficiency of the evidence the State presented for each conviction.

We review a claim of insufficient evidence to determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *State v. Dreewes*, 192 Wn.2d 812, 821, 432 P.3d 795 (2019) (internal quotation marks omitted) (quoting *State. v. Johnson*, 188 Wn.2d 742, 762, 399 P.3d 507 (2017)).  "[W]e draw all reasonable inferences in favor of the State and against the defendant."  *State v. Gregory*, 25 Wn. App. 2d 12, 18, 521 P.3d 962 (2022).  "'A claim of insufficiency admits the truth of the State's evidence and

all inferences that can be drawn therefrom.'" *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence." *State v. Emery*, 161 Wn. App. 172, 199, 253 P.3d 413 (2011), *aff'd*, 174 Wn.2d 741, 278 P.3d 653 (2012).

With this legal framework in mind, we consider each of Thompson's convictions in turn.

### 1.     Murder in the First Degree by Premeditation

To secure a conviction for murder in the first degree by premeditation, the "to convict" instruction provided to the jury established that the State was required to prove beyond a reasonable doubt, in addition to other elements not relevant here, that Thompson "acted with intent to cause the death of Anthony Gonzalez" and "the intent to cause the death was premeditated." The jury instructions defined premeditation as follows:

> Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

At trial, the State presented testimonial evidence from several witnesses about Thompson's conduct on the night in question. Angelia Jay told the jury that she had heard Thompson tell someone earlier in the day that he was "not a punk bitch," was not "gonna take that shit," and was going to "show all you motherfuckers." Several others testified that they saw Thompson in the

encampment that night and described their observations of his actions. Zachariah Hampton explained that he knew Thompson because they had "hung out" together at the encampment, Thompson approached him and pointed a shotgun at him, and Hampton heard a gunshot after Thompson went into Gonzalez' home. Jeremy McCoy's recollection of the events was similar to Hampton's; McCoy stated that Thompson "drove up in the van and jumped out and immediately had a gun on me" and then shot Gonzalez. Danielle Schoch explained that she had just left the semi-permanent structure where Gonzalez lived when she heard a "loud sound." She further attested that when she returned to Gonzalez' home, Thompson was standing outside with a gun and ordered her to go inside to search Gonzalez' pockets for drugs or money; she saw that Gonzalez was deceased when she entered the home on Thompson's command. Under the deferential standard that applies to this claim, this evidence was sufficient for the jury to find the essential elements of murder in the first degree beyond a reasonable doubt.

### 2. Attempted Robbery in the First Degree

The "to convict" instruction provided to the jury for count 3 explained that in order to secure a conviction for the crime of attempted robbery in the first degree, the State was required to prove beyond a reasonable doubt that Thompson "did an act that was a substantial step toward the commission of the crime of robbery in the first degree" and "the act was done with the intent to commit the crime of robbery in the first degree." The act of robbery in the first degree was explained in an accompanying definitional instruction as "when in the commission of robbery or immediate flight therefrom [the accused] is armed with a deadly weapon or

displays what appears to be a firearm or other deadly weapon or inflicts bodily injury."

Here, the State called Jeremy Fredrickson, the named victim of this charge, to testify to the incident as he experienced it. Fredrickson stated that he knew Thompson and Thompson had approached him at a social gathering and demanded the contents of Fredrickson's pockets. Thompson, after making the demand, clubbed Fredrickson with a shotgun. Applying the relevant standard of review, this evidence was sufficient for the jury to find that the State had proved the required elements of robbery in the first degree beyond a reasonable doubt.

### 3. Attempted Murder in the First Degree

Pursuant to the "to convict" instruction provided for the charge of attempted murder in the first degree as to Bryant Porter, the State was required to prove beyond a reasonable doubt that Thompson "did an act that was a substantial step toward the commission of murder in the first degree" and it was done "with the intent to commit murder in the first degree." Again, the jury was provided a definitional instruction for this crime that explained attempted murder in the first degree occurs when, "with intent to commit murder in the first degree, [the accused] does any act that is a substantial step toward the commission of that crime."

Here, the State relied on testimony from Porter, another member of the West Seattle community to which Thompson and Gonzalez belonged, who asserted that he had known Thompson from childhood and was also familiar with Gonzalez. Porter stated that Thompson had approached the recreational vehicle

where Porter was socializing on the night in question and explained that Thompson had appeared in the doorway as Porter was leaving and shot him in the stomach. Porter's testimony was sufficient for the jury to find that the essential elements of attempted murder in the first degree beyond a reasonable doubt.

### 4. Kidnapping in the First Degree

The State had the burden at trial to prove the essential elements of kidnapping in the first degree, as provided to the jury in the "to convict" instruction; specifically, that Thompson "intentionally abducted Jeremy McCoy . . . with intent (a) to facilitate the commission of murder, or (b) to facilitate the commission of robbery or flight thereafter." The trial judge further instructed the jury as follows:

> "Abduct" means to restrain a person by using or threatening to use deadly force.
> "Restraint" or "restrain" means to restrict another person's movement without consent or legal authority in a manner that interferes substantially with that person's liberty.

To satisfy its evidentiary burden for this allegation, the State introduced testimony from McCoy, the named victim of the kidnapping charge. The State's theory that the compulsion of McCoy by force in order to facilitate Thompson's murder of Gonzalez was the act that constituted the crime charged here in count 5. McCoy testified that he had seen Thompson "[a]bout four times" before "[i]n passing." He explained that Thompson had pulled up to the encampment in a van, pointed a gun at him, threatened him, and told him to take Thompson to Gonzalez' home. As with the other counts, McCoy's testimony was sufficient for the jury to find that the State had proved the essential elements of kidnapping in the first degree beyond a reasonable doubt.

B.     Admission of Video Evidence

Finally, Thompson contends in a single line in his SAG that the "court erred in admitting the improperly authenticated tool rental video over [defense] objection and without proper foundation." However, while he does appear to offer a citation to the record, "Discussion RE: Admission of Video p.7[8]7,"[23] he provides no further argument in support of this purported error.

We review the trial court's decision to admit evidence for abuse of discretion. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). The trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *State v. DeJesus*, 7 Wn. App. 2d 849, 859, 436 P.3d 834 (2019). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(a). To authenticate a video recording, the party offering it "must put forward a witness 'able to give some indication as to when, where, and under what circumstances'" the video was made and that it "'accurately portrays the subject illustrated.'" *State v. Sapp*, 182 Wn. App. 910, 914, 332 P.3d 1058 (2014) (quoting *State v. Newman*, 4 Wn. App. 588, 593, 484 P.2d 473 (1971)). The witness who authenticates the video does not need to have made the recording. *Id.*

---

[23] Thompson's SAG is handwritten and the number is partially indecipherable, but the record on appeal establishes that argument on the admissibility of this video evidence begins on page 787 of the report of proceedings from September 25, 2023. We assume on that basis that this is the record citation he intended to provide.

The State sought to admit through Fredrickson, the victim of the attempted robbery charged in count 3, surveillance video from a nearby business that showed the alley where the underlying incident occurred. Thompson objected on the grounds that the State was attempting to admit the video without testimony from the person who collected it. He argued, "[T]here's a timestamp on the video. And I don't—I don't think they should be able to introduce the video without some testimony that the timestamp is accurate." The State countered that Fredrickson could authenticate the video because he had watched the video, was in the video, could identify himself and what he was doing in the video, and knew the date the video was taken, all of which was sufficient to establish a foundation for admission of the video. The State asserted that Thompson was permitted to present argument regarding the time stamp on the video but such argument went to weight and not admissibility. The trial court agreed with the State that Fredrickson could lay an adequate foundation. Fredrickson testified, consistent with the State's offer of proof during argument on Thompson's objection, that he had viewed the video, had seen himself and Thompson in the video, that the video was an accurate representation of the events in question, and that the timestamp and date on the video were also accurate. The video was admitted and played for the jury during Fredrickson's testimony.

The State's questioning of Fredrickson satisfied the requirements of ER 901 because Fredrickson was able to testify to "'where, when, and under what circumstances'" the video was made and that the video was a true depiction of events. *See Sapp*, 182 Wn. App. at 914 (quoting *Newman*, 4 Wn. App. at 593).

Accordingly, the trial court did not err when it ruled that the State had laid a proper foundation for the footage through Fredrickson and admitted the evidence.

Affirmed.

WE CONCUR:

Díaz, J.                                          , ACJ